*Clear Channel Outdoor, Inc. v. Director, Department of Finance of Baltimore City*
No. 9, September Term 2020


**Taxation – Freedom of Speech – Billboards – Advertising**.  Local excise tax on the business of selling advertising space on billboards did not violate the constitutional provisions that protect freedom of speech and of the press.
United States Constitution, First Amendment; Maryland Declaration of Rights, Article 40.

Circuit Court for Baltimore City
Case No. 24-C-18-001778
Argument: November 6, 2020

IN THE COURT OF APPEALS
OF MARYLAND

No. 9

September Term, 2020

_____

CLEAR CHANNEL OUTDOOR, INC.

V.

DIRECTOR, DEPARTMENT OF FINANCE OF
BALTIMORE CITY

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by McDonald, J.
Getty, J., dissents.

_____

Filed: March 15, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The power to tax is a necessary and essential power of government. Freedom of speech is a necessary and essential element of a democracy. Under the constitutional provisions that protect freedom of speech and of the press, differential taxation of those who operate platforms for speech is "constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints."[1] Those constitutional provisions require "heightened scrutiny" of tax laws that "single out the press," that "target a small group of speakers," or that "discriminate on the basis of the content of taxpayer speech."[2] This case requires us to apply that test to a local tax on billboard operators.

A Baltimore City ordinance imposes a tax on the privilege of selling advertising on billboards that are not located on the premises where the goods or services being advertised are offered or sold. Petitioner Clear Channel Outdoor, Inc. ("Clear Channel"), which is in the business of selling advertising on its billboards in the City, sought a refund from the Respondent City Director of Finance of the taxes that it has paid pursuant to that ordinance. Clear Channel asserted that the ordinance is unconstitutional because a tax related to the sale of advertising on its billboards cannot survive the heightened scrutiny that is applied under the constitutional provisions that protect freedom of speech and of the press. The City denied the request for a refund and Clear Channel initiated this litigation by pursuing an administrative appeal of that decision in the Maryland Tax Court.

---

[1] *Leathers v. Medlock*, 499 U.S. 439, 447 (1991).

[2] *Leathers*, 449 U.S. at 447.

The Tax Court was not persuaded by Clear Channel's constitutional arguments and upheld the City's rejection of the refund request. On judicial review of the Tax Court decision, the Circuit Court for Baltimore City and the Court of Special Appeals reached the same conclusion. So do we.

# I

## Background

### A.    *Baltimore City Enacts a Billboard Tax*

1.    The Ordinance

In June 2013, the Baltimore City Council enacted an ordinance that imposed an excise tax "on the privilege of exhibiting outdoor advertising displays in the City." Ordinance 13-139 (June 20, 2013), *codified as amended at* Baltimore City Code, Article 28 (Taxes), §29-1 *et seq.* (2020) ("the Ordinance").[3] The Ordinance defined an "outdoor advertising display" as:

> [A]n outdoor display of a 10 square foot or larger image or message that directs attention to a business, commodity, service, event, or other activity that is: (i) sold, offered, or conducted somewhere other than on the premises on which the display is made; and (ii) sold, offered, or conducted on the premises only incidentally if at all.

§29-1(d). The signs containing such displays are commonly referred to as billboards. However, as the definition indicates, the Ordinance does not encompass a sign that

---

[3] Unless otherwise indicated, statutory references are to sections of Article 28 of the Baltimore City Code.

advertises a business or other activity on the premises where the sign is located – *i.e.*, the Ordinance applies only to off-site billboards.

The Ordinance levies the tax on the "advertising host" – defined as a person who owns or controls the billboard and charges for its use as an outdoor advertising display. §§29-1(b), 29-3.[4] The tax is assessed annually based on the size and type of display: $15 per square foot for an electronic display that changes images more than once a day[5] and $5 per square foot for any other display. §29-3. The tax does not depend on the number of ads, the duration of an ad, or the subject matter of an ad. The advertiser who purchases an ad to be displayed on a billboard is not taxed under the Ordinance.

According to the City, the sole purpose of the Ordinance is to generate revenue. At the time of its passage, the City's Bureau of Budget and Management Research estimated that the Ordinance would generate $1 million in tax revenue for the 2014 fiscal year and $1.7 million for each fiscal year thereafter. *See* Memorandum from the Bureau of Budget & Management Research to the President and Members of the Baltimore City Council (April 25, 2013), available at https://perma.cc/J7T9-KH6T. The Ordinance is part of the City's *Change to Grow* Ten-Year Financial Plan and, according to the Bureau, was "included in the plan to help protect arts and culture funding from further cuts." *Id.*

---

[4] While individuals and various types of entities are included in the definition of "person" in the ordinance, governmental entities are excluded. §29-1(e).

[5] A digital billboard may change images frequently during a day and thus serve multiple advertisers in the same location during that day. A different City law limits the frequency of the alteration of images on a digital billboard. Baltimore City Code, Article 32 (Zoning), §17-407(c).

2.      Billboards in Baltimore City

It is undisputed that the Ordinance affects 760 signs operated by four entities, including Clear Channel.  It also appears to be undisputed that Clear Channel owns the vast majority of the affected billboards, which account for approximately 90% of the tax revenue generated by the Ordinance.  The highly concentrated billboard market in the City may be due, at least in part, to the fact that the City banned the construction of new billboards in March 2000.[6]

While Clear Channel primarily displays content supplied by third parties who pay for the use of its billboards, it also occasionally displays its own content.  Although the billboards are largely devoted to commercial advertising, like other advertising platforms, some of the billboards also on occasion carry messages concerning sports and breaking news, as well as political messages and public service announcements, sometimes without charge.  Like other advertising platforms, Clear Channel decides what it will allow to appear on its billboards as it allocates the limited space available.  Testimony and exhibits presented in the Tax Court hearing touched upon the editorial discretion exercised by Clear Channel.  Clear Channel prohibits some messages outright, such as those related to sexually-oriented businesses and those it deems factually inaccurate.  According to Clear

---

[6] *See* Baltimore City Code, Article 32 (Zoning), §17-406(a)(1) (2020) ("Except as otherwise specifically provided in this Code, the erection, conversion, placement, or construction of new billboards, static or digital, is prohibited"); Jamie Stiehm, *O'Malley Signs His First Bill into Law, Prohibits Construction of Billboards; Industry Has Threatened to Challenge Law in Court*, The Baltimore Sun (Mar. 28, 2000), available at https://perma.cc/F8PB-3KYG.

4

Channel, it vets political messages for factual accuracy and ensures that no side of a political issue or electoral race receives favorable pricing.

**B.    *Clear Channel Challenges the Tax***

Shortly after the City enacted the Ordinance, Clear Channel sought to have it struck down as unconstitutional. An initial foray in federal court failed on jurisdictional grounds. Clear Channel then pursued a refund of taxes paid to the City under the Ordinance, citing the same constitutional grounds. That effort resulted in litigation in State courts, including this appeal.

1.    Federal Declaratory Judgment Action Fails for Lack of Jurisdiction

In August 2013, Clear Channel brought an action challenging the Ordinance in federal court, arguing that the Ordinance impermissibly regulated commercial speech in violation of the First and Fourteenth Amendments of the United States Constitution. The City responded that, because the Ordinance imposes a tax, the Tax Injunction Act deprived the federal court of subject matter jurisdiction.[7] In December 2015, the federal district court agreed and granted summary judgment in favor of the City. *Clear Channel Outdoor, Inc. v. Mayor and City Council of Baltimore*, 153 F. Supp. 3d 865, 875 (D. Md. 2015).

---

[7] The Tax Injunction Act prohibits federal district courts from enjoining, suspending, or restraining "the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. §1341 (2020).

2. Clear Channel Pays Taxes and Requests a Refund

Following the federal court decision, Clear Channel paid the tax due under the Ordinance for the 2014 and 2015 fiscal years under protest. It requested a refund from the City, reiterating its argument that the tax is unconstitutional under the First and Fourteenth Amendments, and also invoking Article 40 of the Maryland Declaration of Rights. The City denied Clear Channel's refund request. It responded to Clear Channel's arguments, asserting that, because the Ordinance is a revenue-raising measure that satisfies rational basis review, it is constitutional. In July 2016, Clear Channel paid the tax due under the Ordinance for the 2016 fiscal year and again requested a refund – a request that was again rejected by the City.

3. Maryland Tax Court Affirms Denial of Refund

Clear Channel pursued an administrative appeal of the City's denial of its refund requests in the Maryland Tax Court. Again invoking the First Amendment and Article 40, Clear Channel argued in the Tax Court that messages on billboards are constitutionally protected speech. It asserted that the tax imposed by the Ordinance targets a limited number of speakers, thereby chilling speech, and that the burden that the Ordinance places on such speech is not narrowly tailored and outweighs any governmental interest that the Ordinance advances.

The Tax Court rejected Clear Channel's arguments. It noted the "strong presumption in favor of duly enacted taxation schemes." *Clear Channel Outdoor, Inc. v. Department of Finance of Baltimore City*, Appeal No. 16-MI-BA-0571 (February 27, 2018), 2018 WL 1178952 at *2-3 (quoting *Leathers v. Medlock*, 499 U.S. 439, 451 (1991)).

6

The Tax Court concluded that an excise tax imposed on the privilege of exhibiting outdoor advertising displays is "a tax on the privilege of continuing in business, not on exercising free speech." *Id*. Indeed, the Tax Court continued, Clear Channel's conduct as a billboard operator was insufficiently communicative for the First Amendment to come "into play," because Clear Channel "does not express or say anything; it only sells space to advertisers who say things." *Id.* The Tax Court concluded that the Ordinance does not "impose[] a burden on free speech" and is rationally related to the legitimate governmental purpose of raising revenue. *Id.*

The Tax Court also concluded that, although the burden of the tax falls only on Clear Channel and a few other billboard operators, the Ordinance does not target a limited number of speakers. According to the Tax Court, the criteria used to determine the amount of tax (size and type of billboard) did not raise a constitutional issue because those criteria are unrelated to the extent of circulation and apply to all off-premises billboards. *Id.* The Tax Court stated that there was a rational basis for classifying large and immobile billboards separately from other signs for tax purposes. *Id.* The Tax Court further noted that the tax applies to a small group of billboard operators at least in part because of "the City's long-standing zoning regulation controlling billboards and the concentrated marketplace in the City," not the Ordinance's structure. *Id.*

Based on this analysis, the Tax Court affirmed the City's denial of Clear Channel's refund requests.

4.      Judicial Review of the Tax Court Decision

Clear Channel sought judicial review of the Tax Court's decision in the Circuit Court for Baltimore City. That court affirmed the Tax Court's decision, reiterating much of the Tax Court's analysis and concluding that the decision was legally correct and supported by substantial evidence. *Clear Channel Outdoor, Inc. v. Department of Finance of Baltimore City*, Case No. 24-C-18-001778 (October 24, 2018), 2018 WL 7890750. Clear Channel then appealed to the Court of Special Appeals, which also affirmed the Tax Court in a reported decision. *Clear Channel Outdoor, Inc. v. Director, Department of Finance of Baltimore City*, 244 Md. App. 304 (2020). Clear Channel then filed a petition for a writ of *certiorari*, which we granted.

## II

### Discussion

Clear Channel asks us to reverse the decisions of the courts below and ultimately that of the Tax Court. It argues that the Ordinance violates the constitutional provisions that protect freedom of speech. It contends that a tax on a billboard advertising business is subject to "heightened scrutiny" under those constitutional provisions and that the Ordinance improperly targets a small group of speakers – billboard operators – in levying the tax.

### A.      *Standard of Appellate Review*

The Tax Court is an administrative agency, and its decisions are reviewed under the same appellate standards generally applied to agency decisions under the Maryland Administrative Procedure Act. Maryland Code, Tax-General Article, §13-532(a)(1). In

8

an appeal from judicial review of an agency decision, we directly review the agency's decision rather than the decision of a circuit court or of the Court of Special Appeals. *Office of People's Counsel v. Public Service Commission*, 461 Md. 380, 391 (2018). Accordingly, we review directly the Tax Court's decision and apply the same standard of review as those courts did.

When the Tax Court interprets Maryland tax law, we accord that agency a degree of deference as the agency that administers and interprets those statutes. *Comptroller v. Wynne*, 431 Md. 147, 160-61 (2013). In this case, the Tax Court decision turned on application and analysis of the First Amendment of the federal Constitution as well as Article 40 of the Maryland Declaration of Rights. Because our review concerns issues of constitutional law, we do not defer to the agency's determination of those issues. *Wynne v. Comptroller*, 469 Md. 62, 80 (2020).

**B.      *Governing Principles under the State and Federal Constitutions***

1.  The First Amendment and Article 40

The First Amendment to the federal Constitution is made applicable to the states by the Fourteenth Amendment and, in relevant part, enjoins the enactment of laws "abridging the freedom of speech, or of the press." Its Maryland counterpart, Article 40 of the Maryland Declaration of Rights, provides "[t]hat the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Although the two constitutional provisions are worded differently and this Court has sometimes held out the possibility that Article 40 could be construed differently from the

9

First Amendment in some circumstances, the Court has generally regarded the protections afforded by Article 40 as "coextensive" with those under the First Amendment. *Newell v. Runnels*, 407 Md. 578, 608 (2009); *State v. Brookins*, 380 Md. 345, 350 n.2 (2004). Neither party has suggested that the circumstances of this case provide a reason for departing from that general rule, and we see none. Accordingly, our analysis of Clear Channel's contentions under the First Amendment applies equally to the same issues under Article 40. For convenience, we will refer solely to the First Amendment in discussing the applicable standards in this opinion, but that discussion also encompasses the application of Article 40.

2. Standard for Review of Legislation under the First Amendment

In its decision in this case, the Tax Court considered whether it should apply strict scrutiny, also called "heightened scrutiny," or rational basis scrutiny to the Ordinance, and concluded that rational basis was the appropriate test. The heightened scrutiny standard is well established in the case law for situations in which legislation infringes First Amendment rights. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 362 (1976). The source of a rational basis test in these circumstances is less clear as the judiciary does not have a freestanding general charge to review all legislation for rationality. A rational basis test does apply when a party challenges a classification in legislation under the Equal Protection Clause in circumstances where neither a fundamental right nor a suspect classification is involved. *Regan v. Taxation with Representation*, 461 U.S. 540, 546-51 (1983). Many cases involving challenges to legislation under the First Amendment have also relied on the Equal Protection Clause, and the courts have applied a rational basis test after

10

concluding that the heightened scrutiny test under the First Amendment was not applicable. *Id*.; *see also Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 227 n.3 (1987) (noting that a publication's "First Amendment claims are obviously intertwined with interests arising under the Equal Protection Clause"). Although Clear Channel has not explicitly invoked the Equal Protection Clause in its complaint in this case, it is at least implicit in its argument that a tax triggered by the sale of advertising on off-site billboards treats it unequally. Thus, it was not inappropriate for the Tax Court to conclude that it should apply a rational basis test if heightened scrutiny under the First Amendment did not pertain to the matter at hand.[8]

In any event, there does not appear to be any dispute that, if a rational basis test is applied, the Ordinance passes that test as a revenue raising measure that is clearly within the taxing authority of the City. Thus, the resolution of this case depends on whether the First Amendment's heightened scrutiny standard is to be applied here and, if so, whether the Ordinance survives that scrutiny.

3. Billboards and Speech

There is no dispute that billboards are a platform for speech and that the text or images that appear on billboards are entitled to some First Amendment protection. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (plurality opinion)

---

[8] Clear Channel has contended, without much elaboration, that, if heightened scrutiny does not apply, an intermediate scrutiny test should be applied. However, none of the cases concerning the taxation of speech platforms on which it relies applies such a test and, for the reasons stated later in this opinion, the cases it cites involving intermediate scrutiny do not apply in the circumstances of this case. *See* footnote 16 below.

("Billboards are a well-established medium of communication, used to convey a broad range of different kinds of messages"); *Donnelly Advertising Corp. of Maryland v. City of Baltimore*, 279 Md. 660, 667 (1977) (ads on billboards are "entitled to some protection by the First Amendment, whether they be of a commercial, political, or charitable nature"). However, it is also true that billboards "combine communicative and noncommunicative aspects," the latter of which "the government has legitimate interest in controlling." *Metromedia,* 453 U.S. at 502. Because the regulation – or taxation – of the noncommunicative aspects of a medium may "impinge to some degree on the communicative aspects," it has fallen to the courts to reconcile the exercise of those governmental powers with the protection provided by the First Amendment. *Id*.

### 4. Taxation and the First Amendment

#### a. Supreme Court Case Law

Taxation is, of course, essential to the support of government – a certainty sometimes equated to mortality.[9] Unsurprisingly, perhaps, the Supreme Court has reiterated that, even in the context of the First Amendment, there is a strong presumption in favor of the validity of tax legislation. *Leathers v. Medlock*, 499 U.S. 439, 451 (1991); *Regan v. Taxation with Representation*, 461 U.S. 540, 547-48 (1983). Nevertheless, the choices that a legislature makes in devising a tax scheme may be a means of penalizing or discouraging speech and thereby violate the First Amendment. The Supreme Court has

---

[9] Benjamin Franklin is said to have coined the phrase "Nothing is certain except death and taxes." National Constitution Center, *Benjamin Franklin's last great quote and the Constitution* (November 13, 2019).

grappled in a series of cases with defining when a taxation scheme involving public media may infringe First Amendment rights. *See Leathers, supra.*; *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983); *Grosjean v. American Press Co.*, 297 U.S. 233 (1936).

*Grosjean*

In *Grosjean,* Louisiana imposed a 2% gross receipts tax on the sale of advertising in newspapers, magazines and other publications with a circulation of more than 20,000 copies per week. 297 U.S. at 240. Only 13 of the 137 newspapers circulating in Louisiana at that time were subject to the tax. *Id.* at 241. The publishers of the newspapers subject to the tax brought an action to enjoin it, invoking the First Amendment.

In discerning the purpose of the First Amendment, the Supreme Court recounted a brief history of British taxes on newspapers that were effectively "taxes on knowledge" and that acted as a prior restraint on the free press, which the Court lauded as "one of the great interpreters between the government and the people." *Id*. at 246-50. The Court observed that the opposition to such laws was not so much an effort to avoid taxation as to "preserve the right of the English people to full information in respect of the doings and misdoings of their government." *Id*. at 247. On the other hand, the Court stated that the concern that a particular tax might be motivated to suppress criticism did not relieve newspapers from "ordinary forms of taxation for support of the government." *Id.* at 250.

In the case before it, the Court found the Louisiana tax to be "suspicious" as the tax was measured, not by the volume of advertising, but solely by the extent of the newspaper's

circulation, with the "plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Id.* at 251. Although not explicitly mentioned in the Court's opinion, it was apparently well known at the time that the proponents of the measure had a retaliatory motive similar to that underlying the English tax legislation described in the Court's opinion as part of the Framers' inspiration for the First Amendment.[10]

*Minneapolis Star*

The *Minneapolis Star* decision concerned certain amendments to the Minnesota sales and use taxes. Prior to the amendments, periodic publications such as newspapers had been exempt from those taxes. 460 U.S. at 577. As a result of the amendments, the newspapers remained exempt from the sales tax, but ink and paper used in the publications were made subject to the use tax; a provision exempted the first $100,000 of those items consumed by a publication. *Id.* at 577-78. The end result was that only a small fraction of the newspapers circulating in Minnesota – 14 of 388 newspapers – were subject to the use tax and one publisher accounted for two-thirds of the revenues from the tax. *Id.* at 578-79.

---

[10] *See City of Baltimore v. A.S. Abell Co.*, 218 Md. 273, 284-85 (1958) (noting that the tax under review in *Grosjean* was supported by Senator Huey Long as a form of retaliation against publications that had opposed his political agenda); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 579-80 (1983) (quoting a circular distributed by the Louisiana governor and Senator Long characterizing the publications subject to the tax as "lying newspapers" and the Louisiana tax as a "tax on lying"); *see also* Edward J. Gerald, The Press and the Constitution 1931-1947 at 100-01 (1948).

The Supreme Court found that, although newspapers are appropriately subject to general economic regulation, including taxes, this application of the Minnesota sales and use taxes singled out the press for special treatment. 460 U.S. at 582. The Court observed that the use tax on paper and ink did not serve the normal function of a use tax – offsetting the incentive a sales tax creates for purchasing taxable items out-of-state – because the Minnesota tax applied to items (ink and paper) that were exempt from the sales tax. *Id.* at 582. In addition, and contrary to the "ordinary rule" in Minnesota that only the ultimate retail sale and not intermediate transactions were taxed, this use tax applied to intermediate components even though they would ultimately become part of a publication sold at retail. *Id.* Moreover, the tax not only singled out the press, but targeted a small subset of the press – those using paper and ink costing in excess of $100,000. The Court rejected Minnesota's justification for this disparity – that it was favoring smaller businesses – because the state's tax "resemble[d] more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises." *Id.* at 592. The Court stated that, even if the legislature had no "illicit" intent, "a tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action." *Id.* at 592-93.

*Arkansas Writers' Project*

The *Arkansas Writers' Project* decision concerned application of a gross receipts tax on the sale of tangible personal property in Arkansas. There were numerous exemptions from the tax, including for: "[g]ross receipts or gross proceeds derived from the sale of newspapers" and "religious, professional, trade and sports journals and/or

15

publications printed and published within this State ... when sold through regular subscriptions." 481 U.S. at 224. The Court struck down the tax on two grounds. First, as with the sales and use tax in *Minneapolis Star*, the exemptions from the Arkansas tax meant that the tax effectively targeted a small group of speakers – those magazines not encompassed in the exemptions. *Id.* at 229. Second, the tax discriminated based on content of a taxpayer's speech because application of the magazine exemption depended on a review of the subject matter of the publication. *Id.* As to the latter rationale, the Court stated that it did not matter that the tax was based on the general subject matter of the publication, as opposed to the expression of a particular viewpoint on that subject matter. *Id*. at 230.

*Leathers*

In the *Leathers* decision, the Supreme Court reprised its prior discussions of the First Amendment in the context of tax laws affecting the media, but distinguished the operation of the tax in question from those that the Court had found to violate the First Amendment in *Grosjean*, *Minneapolis Star*, and *Arkansas Writers' Project*.

The *Leathers* case arose from an amendment that extended an Arkansas sales tax on sales of personal property and specified services to include the services of cable television operators. Sales of newspapers and magazines remained exempt from the tax, and the amendment did not extend the tax to satellite broadcast television services. 499 U.S. at 441-43. The tax was challenged as violative of the First Amendment. The Court thus addressed the question "whether the First Amendment prevents a State from imposing its sales tax on only selected segments of the media." *Id.* at 444.

16

The Court summarized the principles it distilled from its prior decisions:

> [D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.

499 U.S. at 447 (citations omitted).[11] The Court also stressed that the inevitable classifications and distinctions made by legislatures in designing a tax statute are entitled to a strong presumption of constitutionality. *Id.* at 451-52.

As to the case before it, the Court observed that the Arkansas tax was generally applicable and did not single out the press; nor was it structured so as to raise suspicions that it was intended to interfere with a cable operator's First Amendment activities. 449 U.S. at 447-48. In contrast to the operation of the tax and exemption in *Arkansas Writers' Project* – which effectively targeted a small group of magazines for the tax and exempted others – the tax at issue in *Leathers* applied uniformly to all cable systems in the state. *Id.* Finally, the Supreme Court concluded that the tax did not discriminate on the basis of the content of taxpayer speech. *Id.* at 449. The Court stressed that the underlying concern of the First Amendment is the potential for censorship of ideas. Thus, "differential taxation

---

[11] Although the *Leathers* opinion referred to the standard of review in such cases with the phrase "heightened scrutiny," the Supreme Court later indicated that the standard was equivalent to that meant by the more familiar phrase "strict scrutiny." *See Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 661 (1994).

of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." *Id*. at 453.[12]

b.  Maryland Case Law

This Court has considered the constraints that the free speech provisions of the State and federal constitutions place on taxation of media on two occasions.  Prior to most of the Supreme Court cases described in the previous section of this opinion, this Court considered a challenge to a Baltimore City ordinance that imposed a sales tax on the sale of advertising in various media, including billboards.  *City of Baltimore v. A.S. Abell Co*., 218 Md. 273 (1958).  Several decades later, following all of the Supreme Court decisions described above, this Court applied the principles set forth in those cases to decide whether the exclusion of an advertising circular from the "newspaper exemption" to the State sales tax violated the First Amendment.  *Maryland Pennysaver Group, Inc. v. Comptroller*, 323 Md. 697 (1991).

*A.S. Abell Co.*

In *A.S. Abell Co*., two Baltimore City ordinances imposed a tax on the gross sales of advertising space and time in newspapers, radio and television broadcasts, and billboards.  218 Md. at 278.  A regulation under those ordinances exempted most broadcast

---

[12] In the Arkansas state courts, the cable television operators had also contended that the tax, which did not apply to satellite television services, violated the Equal Protection Clause of the Fourteenth Amendment.  The Supreme Court left it to the Arkansas Supreme Court to address that issue on remand.  499 U.S. at 453.  The state supreme court later held that the different treatment accorded to cable television and satellite television operators under the Arkansas law satisfied the rational basis test and did not violate the Equal Protection Clause.  *Medlock v. Leathers*, 842 S.W.2d 428, 431 (Ark. 1992).

advertising from the tax – which this Court noted as a possible indication of "discrimination in a constitutional sense against the newspapers." *Id*. at 280. The Court engaged in an extended discussion of the *Grosjean* decision, the leading Supreme Court precedent at that time. Applying that decision to the situation before it, the Court observed that the Baltimore City tax was imposed on only a segment of the advertising industry – primarily newspapers and broadcasters – and "singled out" entities subject to the protection of the First Amendment. *Id*. at 287-88. The Court held that such a tax violated the free speech rights of the newspapers and broadcasters and effected just as serious a restraint upon First Amendment rights as one with an ulterior retaliatory motive, as apparently had been the case with the tax in *Grosjean*. *Id*. at 289.

The Court did not classify billboards as equivalent to newspapers and broadcast media and did not reach the question whether a tax on billboard advertising revenue would violate the First Amendment. It assumed, without deciding, that the tax was constitutional as it related to billboard operators. *Id.* at 289. However, the Court concluded that the City would not have adopted the tax if the tax had applied only to billboard advertising and that therefore the provision concerning billboards was not severable. *Id.* at 289-90.[13] Accordingly, the Court struck down the tax as it related to billboard advertising as well.

---

[13] The Court made a similar assumption as to the constitutionality of the tax as it applied to out-of-state purchasers of advertising and came to a similar conclusion as to severability of that application of the tax.

*Maryland Pennysaver*

Several decades later and a few months after the Supreme Court's decision in *Leathers*, this Court had occasion to apply that decision in *Maryland Pennysaver*. That case involved a publication printed on newsprint and referred to as an advertising circular or "pennysaver." The publication consisted largely of commercial ads purchased by businesses and classified ads purchased by individuals, but also included content labeled "Community News" consisting primarily of announcements of activities such as meetings, fundraisers and social events, as well as some columns on topics of local interest authored by public officials. 323 Md. at 699-700. The publisher sought to have the publication declared exempt from the State sales tax under a regulation known as the "newspaper exemption." Alternatively, the publisher argued that exclusion of the pennysaver from that exemption would violate the First Amendment. *Id.* at 701.

This Court first determined that the pennysaver did not fall within the newspaper exemption as a matter of statutory and regulatory construction. 323 Md. at 701-11. It then assessed the constitutional question by reviewing the four Supreme Court decisions outlined in the previous section of this opinion and quoting extensively from *Leathers*. In concluding that application of the sales tax to the pennysaver was constitutional, the Court noted that the sales tax was broad-based, that other publishers with advertising targeted to localities were subject to the tax, and that it was not inappropriate to treat the pennysaver differently from a newspaper in light of the pennysaver's "overwhelming commercial speech content." *Id*. at 714-15. It concluded that there was "no threat to the dissemination of ideas" in treating a pennysaver differently from a newspaper and that there was no

infringement of First Amendment rights.[14]  The Court also held that the exclusion of shopping advertisers from the definition of newspaper in the sales tax regulations was not unconstitutionally vague, at least as applied to the publication before the Court.  *Id*. at 716-17.

   c.  Summary

We discern the following principles from the decisions of the Supreme Court and this Court outlined above:

● The potential for censorship or prior restraint by the government was the animating concern of the First Amendment, particularly with respect to "the press" as the interpreter of the activities of the government to its citizens and with respect to a law that was effectively a "tax on knowledge."  However, to demonstrate infringement of First Amendment rights, it is not essential that a party show, or that a court find, that a legislature had an illicit intent in enacting a law that has such an effect.  *Grosjean*; *Minneapolis Star*; *A.S. Abell Co.*

● Tax laws are presumed to be valid and constitutional, even in the context of a First Amendment challenge.  The First Amendment does not exempt the press, or other speakers, from broad-based taxes.  *Grosjean*; *Leathers*.

● A tax may not "single out the press" unless there is a compelling reason for doing so.  *Grosjean*; *Minneapolis Star*; *Leathers*.

_____

[14] Even if the law was considered a restriction on speech in the pennysaver, the Court held that the tax was not a "restriction of constitutional dimension."  323 Md. at 715.

● A tax that targets a small group of speakers among the press is suspect, particularly when that small group is defined by the content of its publication, even if not by the expression of a particular viewpoint. *Grosjean*; *Minneapolis Star*; *Arkansas Writers' Project*; *Leathers*.

● Differential taxation of speakers is particularly suspect under the First Amendment when it discriminates on the basis of the content of speech and targets the expression of particular ideas or viewpoints. *Grosjean*; *Arkansas Writers' Project*; *Leathers*.

### C.    *Whether the Ordinance is Constitutional*

Applying the principles outlined in the previous section of this opinion, we conclude that the First Amendment does not require heightened scrutiny of the Ordinance and that the Tax Court correctly concluded that the Ordinance is constitutional.

First, there is no dispute that the Ordinance is within the taxing power of the City,[15] was properly enacted by the Mayor and City Council, and is entitled to the strong presumption of validity accorded to such enactments.

As this Court did in *Maryland Pennysaver*, we look to the framework provided by *Leathers*. *Leathers* makes clear that a tax on selected segments of the media, like the tax

---

[15] The City has the "power to tax to the same extent as the State of Maryland has or could exercise said power within the limits of Baltimore City as a part of its general taxing power." Baltimore City Charter, Article II, §40; Maryland Constitution, Article XI-A; *see generally* Department of Legislative Services, Maryland Handbook Series, Vol. VI (Maryland Local Government) at 108 (2018) (taxing authority of Baltimore City under State law established in Baltimore City Charter).

on billboards here, does not necessarily trigger heightened scrutiny[16] or violate the First Amendment. Instead, differential taxation triggers heightened scrutiny "when it threatens to suppress the expression of particular ideas or viewpoints." 499 U.S. at 447. The Tax Court made no finding of a retaliatory motive or potential for censorship such as that which inspired the tax law in *Grosjean* and the record would not support such a finding, if one had been made.[17] There is no evidence that the Ordinance, in intent or effect, is designed to censor or exert a prior restraint on the press. Nothing in the legislative history of the

---

[16] Clear Channel argues that even if the Ordinance is not subject to strict scrutiny, it should be subject to intermediate scrutiny, citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994). *Turner* concerned a "must carry" regulation of the Federal Communications Commission ("FCC") that required cable television systems to devote a portion of their channels to local broadcast television stations. In upholding the regulation, the Supreme Court applied an intermediate scrutiny test rather than heightened or strict scrutiny. Although the FCC regulation was content-neutral, it directly concerned what speech would appear on the cable stations, unlike the excise tax at issue in this case.

Likewise, the intermediate scrutiny applicable to commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557 (1980) has no application here. *Central Hudson* concerned a state regulation that directly regulated commercial speech – it prohibited advertising by utilities that promoted the use of electricity. Accordingly, the four-part test created by that decision was addressed to how a regulation restricts content.

Even if an intermediate standard were to be applied, the Ordinance would satisfy that standard. *Cf. Donnelly Advertising Corp. of Maryland v. City of Baltimore*, 279 Md. 660, 668-70 (1977) (applying intermediate scrutiny and rational basis tests in holding that ordinance requiring removal of all off-premises signs in urban renewal district did not violate First or Fourteenth Amendments).

[17] Clear Channel suggests that an owner of a site leased for a billboard may be wary of messages critical of local officials and that, some years ago, City officials might have been unhappy about a billboard advertisement purchased by a public employees' union that was critical of the City government at that time. Neither conjecture was linked to the Ordinance.

23

Ordinance suggests such an intent and, as outlined below, the tax imposed by the Ordinance has no relation to the content of the ads that might be displayed on Clear Channel's billboards. The Ordinance does not regulate the size of a billboard, where it can be located, what it can say or who can say whatever it says.

In the absence of a finding that the Ordinance was designed to suppress the expression of ideas or viewpoints, we consider the criteria identified in *Leathers* that may require heightened scrutiny: (1) whether the Ordinance "singles out the press"; (2) whether it "targets a small group of speakers"; and (3) whether it "discriminates on the basis of the content of taxpayer speech." 499 U.S. at 447. Although Clear Channel primarily focused on the second *Leathers* criterion in the Tax Court and in its petition for *certiorari* in this case,[18] it has asserted in brief and argument that all three apply. Accordingly, we shall address all three.

1. Whether the Ordinance Singles Out the Press

Although Clear Channel does not primarily urge a heightened scrutiny standard based on a theory that the Ordinance singles out the press, it does assert that off-site billboards are part of "the press." This seems a bit of a stretch. The First Amendment

---

[18] In its petition for a writ of *certiorari*, Clear Channel posed the following two questions:

> 1 – Is the operation of billboards protected by the First Amendment, thereby subjecting its taxation to heightened scrutiny?

> 2 – Does the Tax single out a single platform for speech or a small group of speakers, thereby subjecting it to heightened scrutiny?

decisions invalidating taxes on which Clear Channel relies – *Grosjean, Minneapolis Star, Arkansas Writers' Project,* and *A.S. Abell Co.* – all singled out newspapers, broadcasters, magazines, and other topical periodicals for special treatment – the sort of media that, in the words of the *Grosjean* decision, act as "interpreters of the government" to its citizens and that report on the "doings and misdoings" of government.

Nevertheless, as methods of expression change, the First Amendment principles that protect speech adapt. For example, the Supreme Court noted that, upon the rise of cable television during the latter half of the 20th century, a cable television operator "partakes of some of the aspects of speech and the communication of ideas as do the traditional enterprises of newspaper and book publishers, public speakers, and pamphleteers." *City of Los Angeles v. Preferred Communications*, 476 U.S. 488, 494 (1986). As a result, a cable television operator is thus "engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press.'" *Leathers*, 499 U.S. at 444.[19] Billboards have long displayed messages other than commercial advertising and the development of digital billboards creates the opportunity for a single billboard to display a greater number and variety of messages.

Even so, the billboards subject to the Ordinance are more akin to the advertising circular in *Maryland Pennysaver* which, although it devoted some space to editorial

---

[19] This Court has similarly recognized that freedom of the press is not necessarily limited to traditional media when the communication involves "such free and general discussion of public matters as seems essential to prepare people for an intelligent exercise of their rights as citizens." *Howard Sports Daily v. Weller*, 179 Md. 355, 361 (1941).

content, was primarily a medium for advertising. While Clear Channel exercises some discretion in deciding how to allocate the scarce space on its billboards to its best advantage, it does not claim to be a newsgathering organization that curates what it disseminates according to journalistic principles. It is more accurately described as a commercial advertising vehicle that dabbles in non-commercial content, paid and unpaid.

The fact that a billboard may function on occasion or in some measure like the traditional "press" does not make it equivalent to a newspaper or broadcaster for purposes of the First Amendment. Unlike traditional media that fall within the rubric of "the press," billboards could be limited or banned entirely – as Baltimore City has done prospectively – under the land use laws for esthetic and safety reasons without offending the First Amendment.[20] *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512, 541, 559-61, 570 (1981); *Major Media of the Southeast, Inc. v. City of Raleigh,* 792 F.2d 1269, 1272 (4th Cir. 1986).

Clear Channel's billboards thus may qualify as a medium that in some small aspect functions similarly to what is traditionally referred to as "the press." However, even from that perspective, the Ordinance can hardly be said to "single out" the press. A tax singles out the press when some aspect of it indicates "a purposeful attempt to interfere with First Amendment activities" or it "is structured so as to raise suspicions that it was intended to

---

[20] A billboard operator may be of two minds about this. While such regulation could portend the demise of the operator's business, it also – as in the case of Clear Channel's Baltimore City billboard business – erects a barrier to entry that fortifies the market power of a dominant incumbent operator.

do so." *Leathers*, 499 U.S. at 448. The tax in *Grosjean* singled out widely circulated newspapers and had the "direct tendency" to "restrict circulation." 297 U.S. at 244-45. The Supreme Court found this effect similar to the early English "taxes on knowledge" that curtailed the circulation of newspapers and thus "the opportunity for, the acquisition of knowledge by the people in respect of … the doings or misdoings of their government" that the framers of the First Amendment had in mind. *Id.* at 247. The key in *Grosjean* was not simply that the tax was assessed on an element of the press, but that it singled out those that most acted as government watchdogs. Similarly, the tax in *Minneapolis Star* "single[d] out the press for a different method of taxation" under the otherwise broad-based use tax by taxing components of newspaper production (ink and paper) for the largest newspapers in the state and thus had the effect of "a penalty for a few of the largest newspapers." 460 U.S. at 578.

By contrast, the Ordinance in this case taxes all operators of off-site billboards in the City who sell advertising on those billboards and has no direct or indirect effect on the extent of the circulation of billboards. The fact that it applies only to billboards, without more, is insufficient to deem it a tax that "singles out" the press. As in *Leathers,* there is no indication that the City has taxed billboard operators to interfere with First Amendment activities or that the tax is structured to raise suspicion that it was intended to do so.

2. Whether the Ordinance Targets a Small Group of Speakers

To determine whether the Ordinance targets a small group of speakers, one must first decide how to define the appropriate reference group. "Small," of course, is a word of comparison. If the relevant universe is defined as all entities subject to a tax, then the

27

tax is universal. If the relevant reference group is defined to include many besides those subject to the tax, then the taxed group is by comparison "small."

Unsurprisingly, the parties choose different reference groups to assess this question. Clear Channel argues that the Ordinance targets a small group of speakers because it applies to 760 billboards controlled by four entities, but not the many other outdoor commercial signs in the City or the many other businesses in the City. The City limits its comparison to off-site billboards.

It is instructive to consider the taxes in *Grosjean, Minneapolis Star*, and *Arkansas Writers' Project,* the groups of speakers affected by those taxes, and the benchmark group referenced in each of those cases by the Supreme Court. As indicated in *Leathers*, the design of the taxes in each of those cases affected a smaller group within a larger universe of similar members of the same media. The tax in *Grosjean* singled out higher circulation newspapers but left many more newspapers with lower circulation untaxed. The tax in *Minneapolis Star* fell on newspapers that consumed more paper and ink – which presumably correlated to higher circulation – but left the many more newspapers that consumed less of those components untaxed. As the Court observed in *Leathers*, both of those taxes "selected a narrow group to bear fully the burden of the tax." 499 U.S. at 449. Similarly, the tax in *Arkansas Writers' Project* exempted newspapers and numerous categories of magazines and left only a few magazines subject to the tax, which "operated in much the same way as did the … exemption in *Minneapolis Star*." *Id.* at 446.

Given that the test is whether a law "targets" a small group of "speakers," implying that there are other speakers who are not targeted, the appropriate reference group should

include similarly-situated members of the same medium.  Thus, the principle drawn from these cases is that a tax targets a small group of speakers when it distinguishes among members within related types of media, not simply when it applies to a specific form of media.

It is over-inclusive to group off-premises billboards with all other commercial signs for purposes of this analysis.  Billboards have characteristics as a medium that can warrant separate treatment from other signs.  *See Metromedia*, 453 U.S. at 509 ("We [] hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety.").  Moreover, to hold that any tax on a particular form of media – or group of entities that could be characterized as "speakers" – automatically qualifies as targeting a small group of speakers would inject the First Amendment as a new uniformity requirement for tax legislation that would encumber a legislature's legitimate and important ability to tax.[21]

The Ordinance applies to all off-site billboards in the City for which the operator charges customers for displaying the customer's advertising.  It does not distinguish among billboards according to any other factor, such as the duration or extent of speech (*e.g.*, the circulation of a newspaper) or its subject matter.  The fact that there are only four taxpayers

---

[21] *See Herman v. Mayor and City Council of Baltimore*, 189 Md. 191, 197 (1947) ("The State … may impose different taxes upon different trades and professions and may vary the rates of excise upon various products.  In levying such taxes, the State is not required to resort to close distinction or to maintain a precise, scientific uniformity with respect to composition, use, or value.  To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our government.").

affected by the Ordinance is due largely to market conditions, not the structure of the Ordinance. As noted above, the City banned the construction of new billboards 20 years ago, which has effectively barred new entrants from challenging Clear Channel's near monopoly of the medium.

In our view, the Ordinance does not trigger heightened scrutiny under the First Amendment by targeting a small group of speakers.

3. Whether the Ordinance Discriminates Based on Content

As noted earlier, the tax imposed by the Ordinance does not depend on what messages are displayed on a billboard, who a message is attributed to, or how long any particular message is displayed. Unlike the tax in *Arkansas Writers' Project*, even the general content of the message does not matter. What matters is whether Clear Channel charges the person or entity responsible for the message to display it on the billboard. If Clear Channel devoted a billboard entirely to its own message or to a message of someone else without charge, no tax would be levied under the Ordinance, regardless of the substance of the message. It is the commercial transaction, not the content of the message, that triggers the tax.

Clear Channel argues that the Ordinance discriminates on the basis of the content of taxpayer speech because it applies only to off-premises billboards, and one must read a billboard in order to determine whether it qualifies as an off-premises or on-premises sign. It cites the Supreme Court's recent decision in *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), which held that content-based restrictions on speech in signs could manifest both

in obvious ways, such as by relating to the subject matter of a sign, and in more subtle ways, such as by relating to a sign's function or purpose.

The decision in *Reed* did not hold that an on-premises/off-premises distinction – a common distinction made in the regulation of billboards – was a content-based regulation that would trigger heightened scrutiny under the First Amendment. The sign regulation at issue in *Reed* was content-based on its face for other reasons. 576 U.S. at 164. Notably, while all nine justices joined in the judgment in that case, there were four separate opinions filed in the case. Of the six justices who joined the primary opinion in the case, three also joined Justice Alito's concurrence, which listed types of sign regulation that are *not* content-based. Included on that list were sign regulations "distinguishing between on-premises and off-premises signs." *Id.* at 174-75 (Alito, J., concurring). Justice Kagan's opinion, joined by two other justices, cautioned against an overly expansive definition of content-based sign regulation and, it seems safe to say, would likewise not find an on-premises/off-premises distinction in sign regulation to trigger strict scrutiny. *See id.* at 179-85 (Kagan, J., concurring).[22]

---

[22] As noted in the text, the *Reed* decision did not involve the regulation or taxation of off-premises billboards. Clear Channel primarily relies on a Sixth Circuit decision that extrapolated the holding in *Reed*. That case concerned a Tennessee sign law that prohibited signage within a certain distance of a public roadway, but exempted from that prohibition signs "located on the same premises as the activity or property advertised." *Thomas v. Bright*, 937 F.3d 721, 725 (6th Cir. 2019), *cert. denied*, 141 S.Ct. 194 (2020). The Sixth Circuit concluded that the Tennessee law was not content neutral because it required "Tennessee officials to assess the meaning and purpose of the sign's message in order to determine if the sign violated the Act." *Id.* at 730-33; *see also Reagan National Advertising v. City of Austin*, 972 F.3d 696 (5th Cir. 2020), *petition for cert. filed,* No. 20-1029 (Jan.

31

We join the many courts and commentators who have concluded that, even after the *Reed* decision, a distinction between on-premises signs and off-premises signs in a regulatory or tax law does not discriminate on the basis of content and therefore does not trigger heightened scrutiny under the First Amendment. *See, e.g.*, *Adams Outdoor Advertising LP v. Pennsylvania Department of Transportation*, 930 F.3d 199, 207 n.1 (3d Cir. 2019) (noting that *Reed*'s concurring opinions by Justices Alito and Kagan, "which received a total of six votes, both indicated that on-premise sign regulations are content neutral" and that strict scrutiny would not apply to billboard regulation merely because they exempted on-premise signs); *Geft Outdoor LLC v. Consolidated City of Indianapolis & County of Marion*, 187 F.Supp.3d 1002, 1017 n.2 (S.D. Ind. 2016) (noting that "at least six Justices continue to believe that regulations that distinguish between on-site and off-site signs are not content based and therefore do not trigger strict scrutiny"); *Citizens for Free Speech, LLC v. County of Alameda*, 114 F.Supp.3d 952, 968-71 (N.D. Cal. 2015) (noting that "onsite/offsite" distinctions are "content-neutral under the First Amendment's

28, 2021) (holding that sign code prohibiting digitization of off-premises signs was content-based).

The *Thomas* decision affirmed a similar holding in the federal district court that has been characterized as an "outlier" in terms of its assessment of *Reed* and the on-premises/off-premises distinction. Note, *Free Speech Doctrine After Reed v. Town of Gilbert*, 129 Harv. L. Rev. 1981, 1993 (2016). Moreover, the Sixth Circuit limited the breadth of its decision, noting that "[t]here might be many formulations of an on/off-premises distinction that are content-neutral, but the one before us is not one of them." *Thomas*, 937 F.3d at 733. The Tennessee law at issue directed officials to determine a sign's "purpose" and enumerated criteria to determine whether that purpose made it an on or off-premises sign. *Id.* at 725-26. The Ordinance in this case does not contain similar directions or criteria concerning the purpose or subject matter of a billboard.

free speech clause," even after *Reed*); *see also* Note, *Free Speech Doctrine After Reed v. Town of Gilbert*, 129 Harv. L. Rev. 1981, 1993 n.82 (2016) ("regulations distinguishing between on-premises and off-premises signs should probably be treated as content-neutral regulations of place as the very same sign is treated differently only because of the location in which it is placed"); S.L. Trevarthen & A.M. Hapner, *The True Impact of Reed v. Town of Gilbert on Sign Regulation*, 49 Stetson L. Rev. 509, 533-34 (2020) (concluding that local government may continue to regulate or prohibit off-premise billboards after *Reed*); *cf. Lone Star Security & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1200 (9th Cir. 2016) (holding that a city ordinance that distinguished between billboards that "advertise" and all others "refers to the activity of displaying a message to the public, not to any particular content" and was constitutional under *Reed*).

4. Summary

An ordinance imposing a tax related to the sale of advertising on billboards is indisputably within the City's taxing power and, under First Amendment precedent, is entitled to a strong presumption of constitutionality. Differential taxation of media is subject to heightened scrutiny under the First Amendment when a tax suppresses or threatens to suppress particular ideas or viewpoints by (1) singling out the press, (2) targeting a small group of speakers, or (3) discriminating on the basis of the content of taxpayer speech. The Ordinance at issue in this case does not do so and thus is not subject

to heightened scrutiny under the First Amendment.[23]  The Ordinance clearly survives the application of a rational basis test and, accordingly, is constitutional.

## III

## Conclusion

For the reasons set forth above, we hold that the Ordinance does not violate the First Amendment to the federal Constitution or Article 40 of the Maryland Declaration of Rights.  The Tax Court properly upheld the City's decision to deny Clear Channel's requests for tax refunds.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

---

[23] Notably, the courts that have considered First Amendment challenges to excise taxes based on the sale of advertising on off-premises billboards have reached the same conclusion.  *See Lamar Advantage GP Co., LLC v. City of Cincinnati*, 155 N.E.3d 245 (Ohio Ct. App. 2020), *appeal allowed*, 154 N.E.3d 98 (Oct. 13, 2020); *Adams Outdoor Advertising, Ltd. v. Borough of Stroudsburg*, 667 A.2d 21 (Pa. Commw. Ct. 1995), *appeal denied*, 676 A.2d 1201 (May 30, 1996); *see also Free Speech, LLC v. City of Philadelphia*, 884 A.2d 966 (Pa. Commw. Ct. 2005) (affirming denial of preliminary injunction in First Amendment challenge to billboard advertising excise tax on ground that challenger had not shown likelihood of success on the merits).

Circuit Court for Baltimore City
Case No. 24-C-18-001778
Argument: November 6, 2020

IN THE COURT OF APPEALS
OF MARYLAND

No. 9

September Term, 2020

_____

CLEAR CHANNEL OUTDOOR, INC.

V.

DIRECTOR, DEPARTMENT OF FINANCE OF
BALTIMORE CITY

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

_____

Dissenting Opinion by Getty, J.

_____

Filed: March 15, 2021

> [I]t is said, that a right to tax, in this case, implies a right to destroy; that it is impossible to draw the line of discrimination between a tax fairly laid for the purposes of revenue, and one imposed for the purpose of prohibition.
>
> Chief Justice John Marshall
> *McCulloch v. Maryland*, 17 U.S. 316, 376 (1819).

I respectfully dissent from the Majority's conclusion that Baltimore City's ("the City") excise tax ("the Ordinance") "on the privilege of exhibiting outdoor advertising displays in the city" must only satisfy the low threshold of rational basis review. Balt. City Code, art. 28 § 29-2; *see* Maj. Slip Op. at 33–34. The City's tax raises constitutional concerns that should prompt more rigorous judicial scrutiny. Departing from my colleague's concise and well-written analysis, I instead believe that billboards are a constitutionally protected medium of communication and, thus, any legislation potentially affecting the "speech" from this platform implicates free expression concerns.

As Chief Justice John Marshall explained 200 years ago, the "line of discrimination" is difficult to discern. *McCulloch*, 17 U.S. at 376. The Tax Court concluded that an excise tax imposed on the privilege of exhibiting outdoor advertising displays is "a tax on the privilege of continuing in business, not on exercising free speech." *Clear Channel Outdoor, Inc. v. Dep't of Fin. of Balt. City*, Appeal No. 16-MI-BA-0571 (Feb. 27, 2018), 2018 WL 1178952 at *3; *see* Maj. Slip Op. at 6–7. But how does one distinguish between the "privilege" of being in the business of speech and the speech itself?

The Tax Court's decision assumes that the act of leasing billboard space does not contain sufficient communicative elements to implicate the First Amendment.

However, allowing a tax on the "privilege" of maintaining a speech platform necessary to convey speech that falls within the ambit of the First Amendment is an attempt to draw a line that runs contrary to prior Supreme Court precedent. If the needle can be thread so that the "privilege" of being in the speech business is taxable, yet the speech is not, may local governments, or the state, impose a tax specific to operating radio stations, or printing newspapers, just for the "privilege" of owning that speech platform? To what extent can a municipality tax a provider of speech by distinguishing the speech platform needed for them to convey the speech from the speech that is being disseminated? And why is this "privilege" defined as being outside the bounds of First Amendment protection?[1]

The Tax Court also assumed, and the Majority agrees, that the Ordinance does not "impose[] a burden on free speech." *Clear Channel Outdoor*, 2018 WL 1178952 at *3; *see* Maj. Slip Op. at 33. Instead, I think we can assume that billboard providers like Clear Channel will pass the costs of this tax on to their customers—who are providing the speech. The logic of the Tax Court confusingly, and improperly, creates a blurry distinction between being in the business of conveying speech and the content of the speech that is actually conveyed.

---

[1] If billboards are not considered speech platforms protected by the First Amendment, what is to stop state regulations on the types of messaging or speakers utilizing the medium? Certain political campaigns and candidates may lose a valuable means to interject their messaging into the marketplace of ideas. If outdoor advertising is protected by the First Amendment, but legislatures may impose taxes that are not generally applicable but focused on a singular medium, are more traditional, sacred vehicles of free expression next in line for governmental revenue raising measures?

2

In light of this foggy logic in demarcating a standard, I would find that the Ordinance is not "generally applicable." Instead, the Ordinance applies solely to one class of speech platforms—"outdoor advertising displays"—which ratchets our review to a higher bar of scrutiny. The Ordinance's application to off-premises, but not on-premises, signage further winnows the tax's focus and presents a potential content-based distinction that is blatantly contrary to the First Amendment. Deferring to the City's broad power to tax cannot wash away these concerns. For this tax to be constitutionally permissible, it must meet a more onerous standard of heightened scrutiny.

This Court must acknowledge the potential for a tax to adversely affect paramount constitutional rights, even if that is not the intent of the legislative body, here the city council, in enacting the tax. Indeed, the city council need not intend to burden free speech by limiting speakers and ideas in the marketplace for its enactments to cause that result. The First Amendment protects against both intentional and unintentional burdens on free speech, which can only be achieved by scrutinizing the tax under a heightened burden of review.

## A.     *Any Regulation of Billboards Inherently Implicates Free Expression Concerns, Prompting Heightened Scrutiny.*

Billboards have both physical properties, subject to regulations similar to other structures, and communicative elements that enjoy First Amendment protection. Accordingly, any regulation of billboards inherently implicates free expression concerns, prompting heightened scrutiny. The combination of physical construction and communicative expression form the definitional elements of a "billboard."

3

*See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 522–24 (1981) (Brennan, J., concurring).  The City's zoning code recognizes this dual identity, defining "billboards" by their physical location and their intended communicative purpose.  *See* Balt. City Code, art. 32 § 1-303(g) ("'Billboard' means any sign that directs attention[.]").  Further, billboards are a "well-established medium of communication, used to convey a broad range of different kinds of messages."  *Metromedia*, 453 U.S. at 501 (plurality opinion).

This Court's decision in *Maryland Pennysaver* is distinguishable from the Ordinance here.  *Maryland Pennysaver Grp., Inc. v. Comptroller*, 323 Md. 697 (1991).  Notably, the retail sales tax examined by the Court in that case was extraordinarily broad and applied to mostly everyone, except for newspapers.  This is fundamentally different than a tax that targets one industry or speaker.  Moreover, in finding that the pennysaver publication did not fall within the "newspaper exception," the Court distinguished the pennysaver because of its "overwhelming commercial speech content."  *Id.* at 714–15.  As explained in *Metromedia*, the speech disseminated on billboards varies and encompasses a wide-ranging variety of messages.  453 U.S. at 501 (plurality opinion).  The commercial speech disseminated in the pennysaver and considered by this Court, which consisted almost entirely of advertisements,[2] has considerable differences to the breadth of speech disseminated on billboards.

---

[2] The Court in *Maryland Pennysaver* viewed four illustrative pennysavers in the record extract, totaling 249 pages.  323 Md. at 699–70.  Within those 249 pages, the Court noted that three half-pages were devoted to columns written by politicians serving around Maryland.  In viewing the May 18, 1983, Kent Island/Grasonville pennysaver, the Court noted that it contained two-and-a-half-pages of "Community News," which "consist[ed] primarily of announcements of activities, such as meetings, fundraisers, and social events

4

In evaluating the constitutionality of the Ordinance, this Court should not overlook the role billboards serve in the local media landscape, their ability to provide alternative means of communication, and the public interest the tax may serve compared to the public interest it may hinder if access to this form of messaging is limited by the tax's economic burden. *See Metromedia*, 453 U.S. at 557–58 (Burger, J., dissenting) ("The uniqueness of the medium, the availability of alternative means of communication, and the public interest the regulation serves are important factors to be weighed[.]").

Billboards hold a unique position within local media, offering a platform for both advertisement and speech that contributes to the public interest. As Clear Channel, amicus curiae, and the record highlight, billboards convey a broad array of messages, from commercial speech advertising products, services, and attractions, to public information delivering news, political speech, and public awareness campaigns. *See Metromedia*, 453 U.S. at 501 (plurality opinion) (citation omitted).

Local and national voices alike gravitate towards the medium, as the comparatively low cost of outdoor advertising provides an affordable option for ideas and speakers to enter the public discourse. *See* Dan Rodricks, *Mikulski's Plea for Billboards*, Balt. Sun (Nov. 1, 1991), https://www.baltimoresun.com/news/bs-xpm-1991-11-01-1991305147-story.html [https://perma.cc/HWF4-MTQA] (quoting former United States Senator Barbara Mikulski on her use of billboards in political campaigns: "I know that billboards

---

. . . ." *Id.* at 699. The Court also noted that the pennysaver included two pages each containing a chapter of a "serialized Western novel" that was available for purchase from the publisher. *Id.*

play an important role in political campaigns. . . . I did not have big radio, big TV, but I sure had big billboards"). Campaigns expressing controversial, nontraditional, or marginalized views often utilize billboards as speech platforms. In all, billboards are an accessible medium that the non-incumbent may use to challenge the status quo.

In our modern technology-driven society, billboards are also a medium that expands the marketplace of ideas in a world where consumers frequently seek information from a concentrated bubble of sources. *See, e.g.*, Amanda Hess, *How to Escape Your Political Bubble for a Clearer View*, N.Y. Times (Mar. 3, 2017), https://www.nytimes.com/2017/03/03/arts/the-battle-over-your-political-bubble.html [https://perma.cc/HW6N-3X3L]. To this end, much has been made of our fractured media and how such polarization affects what speech reaches different audiences. For example, the ability to seek out information and ideas in the echo chamber of social media shows the arduous task of introducing new information and ideas to an audience rapt by a concentrated mass of digital sources. *See, e.g.*, Steven L. Johnson, Brent Kitchens, & Peter Gray, *Facebook Serves as an Echo Chamber, Especially for Conservatives. Blame Its Algorithm*, Wash. Post (Oct. 26, 2020), https://www.washingtonpost.com/opinions/2020/10/26/facebook-algorithm-conservative-liberal-extremes/ [https://perma.cc/4H2V-9BSP]. Yet, billboards reach a plethora of audiences and inject speech into the marketplace of ideas without regard for the preferences of the viewer.

The messages displayed on billboards "are constantly before the eyes of observers on the street[]" and can "be seen without the exercise of choice or volition," thus

6

interjecting ideas into what is all too often a closed conversation. *Packer Corp. v. Utah*, 285 U.S. 105, 110 (1932). The driver stuck in traffic or the pedestrian on the sidewalk cannot help but read the content their gaze finds on outdoor advertising. Such messaging has the potential to enliven public discourse or sell a car, but in either case, billboards contain communicative elements that entitle them to protection under the First Amendment.

Inevitably any regulation of billboards will touch on the medium's communicative elements. *See Metromedia*, 453 U.S. at 502–03 (plurality opinion). Those First Amendment concerns must be assessed. *Id.* (quoting *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85, 91 (1977)) ("[A] court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation."). Even if the Ordinance is an excise tax on the "privilege" of conducting Clear Channel's business, when that business is the dissemination of messaging, the tax inherently implicates the First Amendment. *See Clear Channel Outdoor, Inc. v. Dir., Dep't of Fin. of Balt. City*, 244 Md. App. 304, 314–15 (2020).

Speech is protected even if it occurs on a platform that is sold for profit. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62 (1976) ("[W]e may assume that the advertiser's interest is a purely economic one. That hardly disqualifies him from protection under the First Amendment."). Commercial speech

7

clearly falls within the First Amendment's protective cloak.[3] *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562–63 (1980). A tax on the sale of display space on outdoor advertising implicates both these constitutional concerns.

By not extending traditional First Amendment protections to outdoor advertisers, we defy the Supreme Court's evolving understanding of who and what may count as "media" or "speech," and thus how constitutional concerns with both have broadened. *See Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 352 (2010) (recognizing the blurred line between traditional media and other platforms that may provide social and political commentary alongside advancements of technology and rejecting the proposition that the former inherently enjoys constitutional protections greater than the latter). Though rapid advancements in communications technology may have hastened this "freedom of the press" pluralism, the Supreme Court's extension of First Amendment protections to "every sort of publication which affords a vehicle of information and opinion" is long standing. *Lovell v. Griffin*, 303 U.S. 444, 451–52 (1938) ("The liberty of the press is not confined to newspapers and periodicals.").

---

[3] The Supreme Court adopted a four-part test to determine the validity of restrictions on commercial speech, distinguishing the process from its analysis of "fully protected speech":

> (1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective.

*Metromedia*, 453 U.S. at 507 (1981) (plurality opinion) (citing *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 563–66).

A tax on billboard display space imposes an incidental burden on speech, thus its constitutionality must be evaluated, at the least, under an intermediate level of scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661–62 (1994).  Taxing an outdoor advertiser's display space is akin to taxing the ink and paper used by newspapers; both taxes target a medium's means of communication, and thus "impose[] some 'burden'" on speech.  *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 577–78, 583 (1983).  Imposing a tax on the revenue generated from the sale of outdoor advertising space indirectly implicates the ability to speak because these additional costs inevitably will be passed through to customers seeking to utilize this platform.

Because of these incidental First Amendment concerns, the Ordinance's burden on speech must be no greater than is essential to further the alleged government interest.  *See, e.g.*, *Turner Broad. Sys.*, 512 U.S. at 662; *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984).  Taxation of billboards is not per se unconstitutional, but like other billboard regulations, it must be shown to further an important government interest while infringing upon free expression no further than required to achieve this interest.  *See Metromedia*, 453 U.S. at 502–03 (plurality opinion); *Donnelly Advert. Corp. v. City of Balt.*, 279 Md. 660, 668–69 (1977).  Using this standard, this case should be remanded to the Tax Court where the Ordinance must be analyzed against a heightened burden of at least intermediate scrutiny, as a court should evaluate any such regulation on billboards.

In arguing against applying to the tax a heightened burden of scrutiny, much was made, both in the City's brief and at oral argument, of the potentially "absurd result" of a

9

hypothetical situation in which the City may heavily regulate or even ban the location or construction of billboards, yet not so easily tax these platforms. This is a misguided dismissal of a court appropriately applying the intermediate scrutiny warranted by the First Amendment implications present in either hypothetical regulation. There is nothing "absurd" about such jurisprudence.

As "large, immobile, and permanent structures," billboards are subject to regulation "like other structures." *Metromedia*, 453 U.S. at 502 (plurality opinion) (citation omitted). Such regulation stems from the state's police powers, often embodied in a municipality's zoning code. *See Donnelly Advert. Corp.*, 279 Md. at 671; *see also* Balt. City Code, art. 32 § 17-406. But both the Supreme Court and this Court acknowledge that these regulations affect a billboard's communicative aspects as well. Challenges to such laws demand an accounting of such First Amendment concerns through heightened scrutiny. *See Metromedia*, 453 U.S. at 502 (plurality opinion); *Donnelly Advert. Corp.*, 279 Md. at 668–69.

For either regulation to be upheld—the hypothetical zoning law or a tax like the one we assess *sub judice*—it must (i) derive from a constitutionally recognized power of the government, (ii) further a substantial or important government interest (iii) that is "unrelated to the suppression of free expression," and (iv) the "incidental restriction" on First Amendment rights must be "no greater than is essential" to further the government's interest. *Taxpayers for Vincent*, 466 U.S. at 805 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). Both this Court's and the Supreme Court's precedent show that zoning regulations often fulfill these mandates. *See Metromedia*, 453 U.S. at 509 (plurality

10

opinion) (stating legislative concerns about traffic hazards caused by billboards presented legitimate interest unrelated to suppressing speech and doing so as necessary to achieve this end); *Donnelly Advert. Corp.*, 279 Md. at 669, 671 (holding city's police power extended to phase-out period for billboards as part of larger "urban renewal projects" that represented "an important government interest . . . unrelated to the suppression of free expression and no greater than essential").

If the billboard tax falls to this heightened standard, but a zoning law prevails, it is not an "absurd result." It is the court appropriately fulfilling its role of evaluating the constitutionality of such a law within the context of how that law burdens the First Amendment. *See generally Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule."). Such an evaluation should utilize a standard of scrutiny more rigorous than rational review. This Court should respect its own precedent, and that of the Supreme Court, and apply a heightened level of scrutiny to laws affecting billboards.[4] *See, e.g.*, *Taxpayers for Vincent*, 446 U.S. at 805; *Donnelly Advert. Corp.*, 279 Md. at 668–69.

---

[4] Using the standard set by the Supreme Court for regulation that produces an indirect burden on free speech, intermediate scrutiny is the appropriate heightened burden to apply. *See Taxpayers for Vincent*, 466 U.S. at 804–05 (1984); *Donnelly Advert. Corp.*, 279 Md. at 671.

*B.*     *The Ordinance Is Not Generally Applicable and Applies a Tax to One Class of Speakers Utilizing One Medium, Therefore Warranting Heightened Scrutiny.*

The Ordinance is not generally applicable, but instead applies a tax to one class of speakers utilizing one medium—such taxes targeted at media platforms warrant heightened scrutiny. "It is beyond dispute" that media entities are subject to "generally applicable economic regulations without creating constitutional problems." *Minneapolis Star & Tribune*, 460 U.S. at 581. But it is beyond the pale for the government to impose such economic regulations upon just the media or certain speakers therein. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704 (1986) (citing *Minneapolis Star & Tribune*, 460 U.S. at 582–83) ("We imposed a greater burden of justification on the State even though the tax was imposed upon a nonexpressive activity, since the burden of the tax inevitably fell disproportionately—in fact, almost exclusively—upon the shoulders of newspapers[.]").

The Ordinance is just such a selectively applied tax. *See Minneapolis Star & Tribune*, 460 U.S. at 585. It is not "generally applicable." *Leathers vs. Medlock*, 499 U.S. 439, 447 (1991) ("[A] State may impose on the [media] a generally applicable tax").[5]

---

[5] The City asserts that *Leathers* controls the Court's assessment of such taxes selectively applied to certain media. *See* Maj. Slip Op. at 22–23, 27; *Leathers*, 499 U.S. at 453. But Baltimore's Ordinance may be distinguished from the sales tax in *Leathers* in meaningful ways. *Leathers* concerned a "generally applicable" sales tax affecting the gross receipts of cable companies while otherwise exempting traditional members of "the press." *See* 499 U.S. at 441–42. The City relies too heavily on the *Leathers* Court's affirmation that a general tax may apply to the media, in whole or in part. *See id.* at 450–53. The Ordinance was never a general tax which exempted certain media but not billboards. It specifically applies only to billboards. *See* Balt. City Code, art. 28 § 29-2. At best for the City's position, the Ordinance is more akin to must-carry provisions that apply only to cable companies and were thus reviewed under intermediate scrutiny. *Turner Broad. Sys.*, 512 U.S. at 662–63.

12

The tax is "single in kind" in that it applies solely to billboards as a medium. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936); *see also* Balt. City Code, art. 28 §§ 29-1(d), 29-2. In so doing, it takes aim at a specific sub-segment of constitutionally protected speakers. By "appl[ying] only to a single constituency," the Ordinance potentially insulates itself from larger political accountability. *Leathers*, 499 U.S. at 445–46. This narrow focus can operate like a censorial cudgel. *See Minneapolis Star & Tribune*, 460 U.S. at 585. Even if the government's intention is not to censor speech, such may be the effect when the extra burden of not otherwise general taxes is applied. *See id.* at 585, 588. No malicious legislative intent to curb speech need be found to prompt these constitutional concerns. *See id.* at 592 ("Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment."). This differential taxation "places such a burden on the interests protected by the First Amendment that we cannot countenance this treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Id.* at 585.

The Ordinance's application to only certain speakers within the category of outdoor advertisers augments our constitutional concerns. That the tax singles out Clear Channel as a speaker is not constitutionally offensive, as the company's local monopoly makes this fact an incidental result. *Cf. Grosjean*, 297 U.S. at 250–51; *see generally* E. 350 (discussing Clear Channel owning nearly ninety-five percent of the signage affected by the Ordinance). But Baltimore's billboard tax applies solely to companies controlling and selling outdoor advertising display space, and just to those "off-premises" signs larger than ten square feet. *See* Balt. City Code, art. 28 § 29-1(b) & (d).

13

By not applying to smaller signage, or that which is "on-premises," the Ordinance treads perilously close to distinguishing among like speakers based on their content or dissemination. *See Leathers*, 499 U.S. at 447–49. Such a tax may be doubly violative of the First Amendment by applying to a subset of a subset of speakers, and making this distinction based on the messages conveyed. *See id.* at 448–49 (discussing *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987)). When a court finds content-based distinctions in legislation affecting speech, the law must overcome the heightened burden of strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 170–71 (2015).

The City inherently establishes a content-based distinction by defining an "outdoor advertising display" as that which "directs attention to a business, commodity, service, event, or other activity that is: sold, offered, or conducted somewhere other than on the premises on which the display is made." Balt. City Code, art. 28 § 29-1(d)(i) (cleaned up). It categorizes the class of billboards to which the tax applies based on whether they convey a message related to the property to which they are affixed, or to happenings elsewhere. *See id.* Such content-based distinctions must overcome the heightened burden of strict scrutiny. *See Reed*, 576 U.S. at 170–71. Though the Supreme Court's plurality holding in *Metromedia* permitted such a distinction in the context of zoning regulations, it did so after assessing San Diego's regulation under a heightened burden akin to intermediate scrutiny. *See* 453 U.S. at 511–12.

This Court should reverse the Court of Special Appeals and, upon remand, require the City to meet the heightened burden of strict scrutiny for taxes singularly focused on the

14

media or individual classes of media therein. *See Minneapolis Star & Tribune*, 460 U.S at. at 592–93.

## CONCLUSION

The Constitution demands a more strenuous review of regulations, taxation, and related legislation that implicates the First Amendment, directly or indirectly. The First Amendment demands of us a stauncher defense for constitutionally protected mediums of communication. While the line of demarcation may be difficult to discern, here the ordinance clearly requires review at a higher standard of scrutiny. It is for these reasons that I respectfully dissent.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/9a20cn.pdf